**EXXON CORPORATION,
et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,**

**Louisiana Gas Service Company, a Division of Citizens Utilities Company, et al., Intervenors.**

**Nos. 96–1226, 96–1238.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 6, 1997.

Decided June 13, 1997.

Jon L. Brunenkant, Washington, DC, argued the cause for petitioners, with whom Douglas W. Rasch, John B. Chapman, David R. Stevenson and Charles J. McClees, Houston, TX, were on the briefs.

Timm L. Abendroth, Attorney, Federal Energy Regulatory Commission, Washington, DC, argued the cause for respondent, with whom Joseph S. Davies, Acting Solicitor, Bethesda, MD, was on the briefs. Patricia L. Weiss, Attorney, Washington, DC, entered an appearance.

Michael E. McMahon, Wichita, KS, argued the cause for intervenor Koch Gateway Pipeline Company.

. Before WALD and RANDOLPH, Circuit Judges, and BUCKLEY,[1] Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This case arises out of the Federal Energy Regulatory Commission's ("FERC" or "Commission") approval of a partially contested settlement agreement between Koch Gateway Pipeline Company ("Koch") and its customers which set terms, conditions, and rates for Koch's natural gas transportation services. The three orders under review are FERC's initial order approving the settlement and its two consecutive denials of petitions for rehearing. Petitioners are various Koch customers who use the pipeline primarily for short hauls of natural gas; they urge this court to set aside the settlement, claiming (1) that the settlement approval process was procedurally flawed; and (2) that certain portions of the settlement are not supported by substantial evidence. On review, we conclude that the Commission's procedures, although somewhat unusual, were permissible here because petitioners did have an opportunity to submit objections to arguments and evidence put forth by the proponents of the settlement. We also find that there was substantial evidence in the record to support both the Commission's approval of Koch's use of averages from a twelve-month period in calculating its settlement rates, and its approval of Koch's two percent flat fuel charge. However, we conclude that FERC's approval of a significant change in Koch's methodology for calculating mileage-based interruptible transportation rates was unsupported by substantial evidence and therefore we remand to the Commission for further consideration of that issue.

## I. BACKGROUND

On January 31, 1994, Koch filed this Natural Gas Act ("NGA") section 4 rate case in order to institute an increase in its transportation rates. On March 2, 1994, the Commission set the proposed rate increase for hearings before an Administrative Law Judge ("ALJ"). Discovery and settlement negotiations ensued. On February 10, 1995, Koch submitted a proposed comprehensive settlement to the ALJ. In contrast with Koch's original 1994 increase proposal, the settlement produced a reduction in Koch's level of cost recovery from its customers and a reduction in its firm services rates, but an increase in some of its interruptible rates. Joint Appendix ("J.A.") 377. The settlement was either supported or not opposed by the Commission staff, Koch's competitors, and some of Koch's customers, but was contested by other customers including the petitioners here. J.A. 195, 252.

Koch requested that the ALJ first sever the contesting parties so that they could litigate their claims, and then certify the settlement to the Commission as uncontested for parties supporting or not opposing the agreement. The ALJ denied Koch's request in an order dated May 22, 1995. 71 F.E.R.C. ¶ 63,012 (1995) (J.A. 194). Although the ALJ agreed that the contesting parties ultimately would "have an opportunity to be severed from the Settlement, and to proceed to hearings," J.A. 201, nevertheless he concluded that he could not yet certify the settlement. He explained that, under Rule 602(h)(2) of FERC's Settlement Rules, a settlement cannot be certified if any participant originally contested the settlement—even if that participant is ultimately severed—unless the ALJ makes a finding either (1) that there is no genuine material factual issue, or (2) that an initial decision may be omitted and the record contains substantial evidence from which the Commission may reach a reasoned decision on the merits of the contested issues.[2] The ALJ determined that this Rule 602(h)(2) requirement was not satisfied because peti-

---

1. Senior Judge Buckley took no part in the disposition of this case.

2. According to the ALJ, a settlement that was contested at the outset could not be certified under Rule 602(g) as an uncontested settlement even if the contesting parties were severed.

tioners had raised genuine issues of material fact with regard to the interruptible rate design, the flat fuel charge, and several other issues not relevant here, and that the record did not contain substantial evidence sufficient for the Commission to resolve these issues.[3] To remedy this problem, the ALJ ordered that the noncontesting parties submit certain supplemental evidence about contested issues. J.A. 199–200.

The ALJ denied a motion for reconsideration. 72 F.E.R.C. ¶ 63,001 (July 12, 1995) (J.A. 232). However, the ALJ agreed that he would sever the contesting parties, and would also sever the issue of interruptible rate design from the settlement and set that issue for hearing. J.A. 240–41.

Several parties filed interlocutory appeals from the ALJ's July 12 order. These appeals, which were referred to the Commission by the Commission Chair on July 25, 1995, complained that a long delay in entering the settlement would deprive the settling parties of the benefit of their bargain. In response to the appeals, the Commission directed the ALJ to certify the entire record to the Commission. 72 F.E.R.C. ¶ 61,150 (Aug. 2, 1995) (J.A. 309). Subsequently, on September 29, 1995, FERC directed Koch to provide additional evidence on seven specific aspects of the settlement. Koch complied with this request, and the Commission afforded petitioners an opportunity to respond with their own data and arguments. J.A. 311; 317–36; 340–45. However, petitioners did not submit additional data or testimony to rebut Koch's new submissions and instead relied solely upon unsubstantiated assertions by counsel. J.A. 340–45.

On February 1, 1996, after receiving the additional evidence and arguments from the parties, the Commission issued an order reaching the merits of each of the substantive issues raised by petitioners in opposition to the settlement. *Koch Gateway Pipeline Co.*, 74 F.E.R.C. ¶ 61,088 (Feb. 1, 1996). The Commission concluded that "no additional hearings are necessary to resolve any of the issues raised by the opposing parties," and therefore that there was no need to sever the contesting parties or to set the matter for a hearing as the ALJ had indicated. *Id.* at 61,272. Accordingly, the Commission approved the settlement with one modification not at issue here.[4] Two successive requests for rehearing by Koch and the petitioners were denied. This petition for review followed.

### A. *The Commission's Initial Order Approving the Contested Settlement*

In its initial February 1 order, the Commission first turned its attention to procedural questions. The Commission assumed that it was proper to direct the ALJ to certify the entire record in the proceeding to the Commission, and further held: (1) that the ALJ erred by concluding that, once an issue has been contested, it remains "contested"—and thus subject to the requirements of Rule 602(h)(2)—regardless of whether the parties contesting the issue are severed, (2) that the ALJ's decision to direct the consenting parties to file additional evidence "is contrary to one of the basic purposes of the settlement rules," which is "to provide an expedited procedure for approval of uncontested issues," and (3) that the practice of severing contesting parties need not be followed if "the contested issues can be resolved on the basis of Commission policy or on the basis of the record already developed in the proceedings." *Id.* at 61,270–71 (J.A. 378–79). The Commission determined that the record on Koch's settlement proposal, as supplemented after certification to the Commission, contained sufficient information to support a decision on the merits of each contested issue without severing the contesting parties.

Next, the Commission turned to the merits of the settlement. Of those conclusions relevant here,[5] the Commission first rejected

---

**3.** However, the ALJ did find that substantial evidence existed on the record to certify the issues relating to the role of mileage in allocating transmission costs.

**4.** The modification was to eliminate the discount adjustment for the discounted volumes transported by Koch's marketing affiliate.

**5.** We do not summarize those conclusions of the Commission that were not challenged in this appeal.

petitioners' argument that Koch's settlement rates were based on understated projections of firm customer demand and throughput of gas on the pipeline, reasoning that petitioners' argument was premised on an invalid comparison of annualized demand data to one specific month within that twelve-month period. 74 F.E.R.C. at 61,279 (J.A. 387). Second, the Commission rejected petitioners' argument that, although Koch's settlement rates were based on six 100–mile zones whose rates increase with distance, the rates were not sufficiently distance-sensitive and thus disadvantaged short-haul customers like the petitioners. The Commission acknowledged that the settlement rate in the first distance zone (0–100 miles) was higher than the one originally proposed by Koch in its 1994 filing, but found that the rates were nonetheless satisfactory because the settlement rates were lower in all other distance zones (from 101–200 miles and up) and because "the overall rate is lower." *Id.* at 61,281–82 (J.A. 389–90).[6] Finally, the Commission rejected petitioners' challenge to Koch's flat "postage stamp" rate of two percent that compensated Koch for the cost of running compressors to transport gas.[7] The Commission noted that the flat fuel rate was lower than Koch's prior effective flat rate and that, although FERC "generally encourages mileage-based rates where they are appropriate," "in these circumstances, ... [it would] not require a mileage-based fuel charge at this time," although it would continue to monitor the issue. *Id.* at 61,282 (J.A. 390).

Both petitioners and Koch filed petitions for rehearing in which they put forth additional evidence.

B. *The Commission's Orders on Rehearing*

In an order issued May 1, 1996, the Commission first concluded that it would not con-

sider additional evidence submitted by Koch and petitioners with their rehearing petitions because all parties had already been given an ample opportunity to submit all relevant evidence. *Koch Gateway Pipeline Co.,* 75 F.E.R.C. ¶ 61,132 at 61,456 (J.A. 503). The Commission explained:

> The submission of additional factual evidence in a request for rehearing is not appropriate. A request for rehearing provides the parties with a final opportunity to present arguments to the Commission, based on evidence in the record at the time, in light of the Commission's order in the proceeding.

*Id.* The Commission also found that the procedures used in reaching the merits in the February 1 order were adequate, that full trial-type hearings were not necessary, and that there was substantial evidence on the record to resolve the contested issues. *See id.* at 61,457–58 (J.A. 504–05). Turning to the merits, the Commission (1) rejected petitioners' argument that Koch misallocated certain mileage costs as nonmileage costs in a way that disadvantaged short-haul shippers, and reaffirmed its earlier finding that the settlement rates were sufficiently mileage-sensitive to meet FERC standards; (2) reaffirmed its rejection of petitioners' claim that Koch's rates should be measured against billing determinant data derived from the last one or two months of Koch's test period rather than the entire year-long period; and (3) rejected petitioners' renewed argument for a reduced flat fuel charge based on evidence submitted on rehearing.

A further petition for rehearing was denied by the Commission as a matter of law on June 28, 1996. *Koch Gateway Pipeline Co.,* 75 F.E.R.C. ¶ 61,364 (J.A. 522).

---

**6.** Although the Commission agreed that it might have preferred more mileage-sensitive rates, it nonetheless found that the settlement rates were sufficiently mileage-sensitive to meet the Commission's requirement. The Commission also pointed out that it had approved the same zone-mileage system in two prior proceedings involving Koch, and that it would reconsider the question whether the rates were sufficiently mileage-based in Koch's next rate case. *Id.*

**7.** Petitioners claimed that because Koch's fuel costs increase with the distance that the fuel is transported, Koch's flat rate causes short-haul shippers to subsidize fuel consumption of long-haul shippers. Koch, on the other hand, defended the flat rate by arguing that it was very difficult to measure fuel cost distance sensitivity because transportation of gas on its system is atypically multidirectional and flow patterns vary seasonally.

## II. ANALYSIS

Petitioners put forth several reasons why the Commission's order approving the settlement should be invalidated. First, they claim the order was procedurally flawed in that the Commission (1) failed to follow its own regulations when it certified the record and reached the merits of the settlement; and (2) erred when it refused to consider evidence submitted by petitioners with their petitions for rehearing. Second, they contend that three aspects of the settlement approved by the Commission were unsupported by substantial evidence: (1) Koch's change in rates and rate methodology with regard to allocation of mileage and non-mileage costs; (2) Koch's reliance on averages gleaned from a twelve-month test period rather than data from the end of the period; and (3) Koch's flat two percent fuel charge. In place of the settlement entered, petitioners request that the Commission be ordered to enter a revised settlement with (1) the proper allocation of mileage and non-mileage costs; (2) a different annualized billing determinant based on end-of-test-period data; and (3) a reduced flat fuel rate not to exceed 0.802 percent.

### A. *Procedural Arguments*

#### 1. *The Commission's Decision to Certify the Record and Reach the Merits of the Settlement*

■ Petitioners claim that the Commission's decision is invalid because the Commission did not follow its own procedural rules when it ordered the record to be certified. According to petitioners, the plain language of FERC Settlement Rule 602(h)(2) dictates that no contested settlement involving genuine issues of material fact may be certified to the Commission except under Rule 602(h)(2)(iii), which requires both (1) that "[t]he parties concur on a motion for omission of the initial decision . . . or, if all parties

do not concur in the motion, the presiding officer determines that omission of the initial decision is appropriate," 18 C.F.R. § 385.602(h)(2)(iii)(A); and that (2) the ALJ "determines that the record contains substantial evidence from which the Commission may reach a reasoned decision on the merits of the contested issues." 18 C.F.R. § 385.602(h)(2)(iii)(B).

■ In evaluating petitioners' claims here,

> this court is obliged to give considerable deference to the agency's interpretation of its own regulation, according it controlling weight unless it is plainly erroneous or inconsistent with the regulation.

*TransCanada Pipelines Ltd. v. FERC*, 878 F.2d 401, 411 (D.C.Cir.1989); *see also Laclede Gas Co. v. FERC*, 997 F.2d 936, 943 (D.C.Cir.1993) ("[A]n agency's construction of its own regulations is entitled to substantial deference.") (internal quotation marks omitted). Applying this standard of review, we conclude that the Commission did not commit plain error in applying its regulations. As the Commission explains,

> Petitioners' argument is bottomed on the erroneous premise that the Commission's regulations governing an ALJ's authority to certify contested settlements also operate to restrict the Commission's own discretion to require an ALJ to certify a contested settlement to the Commission.

Brief of FERC, at 22. In this case, the ALJ did not certify the settlement of his own accord, subject to the constraints of FERC Settlement Rule 602(h)(2). Rather, the Commission ordered the ALJ to certify the record in accordance with FERC rules governing interlocutory appeals. After the parties filed their appeals from the ALJ's decision with the Commission Chair pursuant to Rule 715, the Chair made an "extraordinary circumstances" finding under Rule 715(c)(5), permitting an appeal to the Commission.[8]

---

8. Under Rule 715(c),

(c) . . .

(1) If a motion to permit appeal is denied by the presiding officer, the participant who made the motion may appeal the denial to the Commissioner who is designated Motions Commissioner. . . .

(5) The Motions Commissioner will permit an appeal to the Commission under this paragraph only if the Motions Commissioner finds extraordinary circumstances which make prompt Commission review of the contested ruling necessary to prevent detriment to the

The Commission in turn suspended further proceedings before the ALJ and ordered the ALJ to certify the entire record to the Commission pursuant to Rule 714.[9] Because it was the Commission and not the ALJ that ordered the record be certified, Rule 602(h)(2), which prohibits an *ALJ* from certifying the record until material issues of fact are resolved, no longer applied to the proceeding. Instead, we defer to the agency's interpretation that, once the record had been certified, the proper rule to apply was Rule 602(h)(1), which permitted the Commission to address the merits of the settlement after supplementing the record so that it contained substantial evidence on which to resolve contested issues.[10]

■ Petitioners also claim that the approval of the settlement agreement was procedurally flawed because, in reaching the merits, the Commission went beyond the scope of the issues raised in the interlocutory appeals. According to petitioners, they relied to their detriment on the ALJ's decision to sever the contesting parties from the settlement. In his July 12 order, the ALJ answered petitioners' complaint that affidavits by non-contesting parties did not by themselves constitute substantial evidence by stating:

> In the instant case, the Presiding Judge has requested evidence from the non-contesting parties to support certain contested aspects of the settlement. The parties, who raised the contested issues and who are complaining about not being given the opportunity to present evidence, will be severed and allowed to proceed to hearings. Therefore, the Presiding Judge fails

to see—absent a specific demonstration—how the contesting parties will be harmed by the process initiated in the May 22 Order.

J.A. 241. The ALJ also indicated that, "because the contesting parties will not be subject to the terms of the settlement, [they] are not entitled to present evidence or cross-examine issues raised in the affidavits requested from the nonconsenting parties." *Id.* In addition to citing these statements by the ALJ, petitioners point out that none of the interlocutory appeals sought to reverse the ALJ's decision to sever petitioners. Petitioners contend that, as a result of these representations by the ALJ and the limited nature of the interlocutory appeals, they did not realize that their interests would be affected by their failure to submit all their evidence and arguments to the Commission in response to Koch's post-certification submissions.

We conclude, however, that petitioners' failure to submit all the evidence they thought necessary pertaining to the merits of the settlement prior to rehearing was, at least in part, their own fault. Although the procedures followed by the Commission in this case were somewhat atypical, and petitioners may have been surprised by the Commission's decision to reach the merits of the settlement, under the circumstances they should have been aware that the Commission might choose to take such action. Once the Commission directed that the ALJ certify the entire record to the Commission, the ALJ no longer exercised control over the case, and petitioners should not have relied on statements the ALJ had made earlier

---

public interest or to prevent irreparable harm to a person....
18 C.F.R. § 385.715(c)(1) & (5).

**9.** Rule 714 provides:
(a) *General rule.* During any proceeding, a presiding officer may certify or, if the Commission so directs, will certify, to the Commission for consideration and disposition any question arising in the proceeding, including any question of law, policy or procedure.
18 C.F.R. § 385.714(a).

**10.** Under Rule 602(h)(1)(I),
If the Commission determines that any offer of settlement is contested in whole or in part, by any party, the Commission may decide the

merits of the contested issues if the record contains substantial evidence upon which to base a reasoned decision or the Commission determines there is no genuine issue of material fact.
18 C.F.R. § 385.602(h)(1)(I). If the Commission determines that the record does not contain substantial evidence, the Commission has the option to "[t]ake other action which the Commission determines to be appropriate." 18 ·C.F.R. § 385.602(h)(1)(ii)(B). Here, the Commission reasonably opted to supplement the inadequate record by directing Koch to file additional evidence and allowing other parties to respond.

about severing parties and issues. Thus, when the Commission requested additional evidence from Koch on a number of substantive issues pertaining to the merits of the settlement—including the issues of measuring throughput on the system and of the flat rate fuel charge—and gave other parties an opportunity to respond to Koch's submissions, petitioners reasonably should have anticipated that the Commission was considering the merits of those issues and should have submitted all available rebuttal evidence pertaining to the Commission's supplemental data requests.

■ On the other hand, because the Commission did not request any supplemental data on the third substantive issue at issue here, the allocation of mileage costs, all parties were limited on that issue to the evidence that they had submitted before the ALJ within the time periods specified by FERC's Settlement Rules. Under Rule 602(f), comments regarding an offer of settlement

> may be filed not later than 20 days after the filing of the offer of settlement and reply comments may be filed not later than 30 days after the filing of the offer, unless otherwise provided by the Commission or the presiding officer.

18 C.F.R. § 385.602(f)(2). Moreover, "[a]ny failure to file a comment constitutes a waiver of all objections to the offer of settlement." *Id.* § 385.602(f)(3). Under Rule 602(f)(3), then, petitioners were required to raise or to risk waiver of all their objections to the settlement during the 20–day comment period, despite the fact that the ALJ had not yet indicated whether or not petitioners would be severed from the agreement. Thus, petitioners cannot be heard to complain that they were unfairly surprised or that they never had any opportunity to submit all their objections to Koch's allocation of mileage costs.[11]

### 2. *The Commission's Refusal to Consider Evidence Submitted on Rehearing*

■ Under normal circumstances, the Commission has no obligation to consider new factual evidence that petitioners failed to submit prior to their petitions for rehearing.[12] Petitioners nonetheless argue that the Commission erred in refusing to consider new evidence under these circumstances because, based on the ALJ's assurances and rulings, petitioners believed they would be severed and have an opportunity for further discovery and/or hearing procedures before the ALJ. As explained above, however, these arguments are not persuasive. With regard to the issue of mileage allocation, on which the Commission did not seek additional evidence after certification, petitioners were limited to the evidence and arguments that they put forth before the ALJ. With regard to the issues of demand determinants and the flat rate fuel charge, petitioners were limited to the evidence they submitted to the ALJ and any evidence that they submitted to rebut Koch's responses to the Commission's post-certification data requests. Petitioners were not justified in failing to submit all their rebuttal data in response to the Commission's requests; we have already explained that, once the entire record had been certified and the Commission had made supplemental requests pertaining to the merits, petitioners had no reasonable basis to assume that the Commission would not reach the merits. Petitioners point to no FERC rule or policy, and we know of none, indicating that they should have been given yet another bite at the apple. Thus, the Commission's refusal to look at evidence proffered for the first time during the rehearing petition stage was justified.

11. Nevertheless, as explained in more detail below, we reverse the Commission's approval of the settlement allocation of mileage costs because it is unsupported by substantial evidence.

12. *See, e.g., Ocean State Power II*, 69 F.E.R.C. ¶ 61,146 (1994) ("The Commission generally will not consider new evidence on rehearing, as we cannot resolve issues finally and with any efficiency if parties attempt to have us chase a moving target.... In this case, [some parties]

submitted initial and supplemental filings in the initial proceedings, and there is no apparent reason that they were unable to identify at that time the additional defects that they now claim to perceive in [one party's] benchmark evidence."); *Philadelphia Electric Co.*, 58 F.E.R.C. ¶ 61,060 (1992) ("[W]e are reluctant to chase a moving target by considering new evidence presented for the first time at the rehearing stage of Commission proceedings.").

## B. Substantial Evidence

Under section 4 of the NGA, Koch bore the burden of proving that its proposed new rates were "just and reasonable."[13] Petitioners argue that three aspects of the rate settlement approved by the Commission are not supported by substantial evidence and have not been shown to be just and reasonable: (1) the allocation of mileage and non-mileage-based costs in the interruptible transportation rates; (2) the billing determinant used to calculate the settlement rates; and (3) the two percent flat ("postage stamp") fuel charge.

### 1. Allocation of "Mileage" Costs

■ In their March 2, 1995 comments on the settlement, petitioners objected to the method used by Koch to allocate mileage and non-mileage costs. The new rate schedule approved by FERC uses the same progressively priced categories for fuel shipments as the previously effective system (Types I–VI, correlating with each 100 mile increment of a haul, e.g., Type I = 0–100 miles; Type II = 101–200 miles; and so on). Rates for each Type of service increase with the mileage traveled. In contrast to the previously effective system, however, the new schedule changes Koch's historic methodology and allocates more expenses to non-mileage-related costs than the old schedule.[14] The result is a less progressive schedule and an increase in the shortest-haul Type I rate, despite a decrease in each of the effective rates for Types II–VI as well as an overall decrease in cost of service for all six Types in the aggregate.[15]

Because petitioners are primarily Type I ITS shippers who use Koch's transportation system mainly for short-haul shipments of natural gas, they claim that they are significantly disadvantaged by the new rates.[16]

Since it was seeking to change its existing interruptible transportation service ("ITS") rates, Koch bore the burden of showing that the new rates were just and reasonable. 74 F.E.R.C. at 61,281 (J.A. 389). Koch argued before the Commission that lowering the Type I rate

> would result in rates for the short hauls that are substantially below what the market will allow [Koch] to collect for these hauls, as well as increases in the long-haul rates, where Koch Gateway is never able to collect its cost of service. The result, [Koch] argues, would be to preclude [Koch] from having any opportunity to collect its cost of service. Further [Koch] asserts, short hauls on [Koch's] system are more valuable than the longer hauls. [Koch] also states that this allocation should eliminate one of the concerns raised with regard to its original filing that [Koch] was seeking to subsidize short haul rates through its long-haul customers.

Id. (as summarized by the Commission in its order). These arguments by Koch, especially Koch's admission that it is never able to collect its cost of service from long-haul shippers, suggest that its new rates do in fact cause short-haul shippers to subsidize long-haul shippers.[17] Despite these apparent concessions by Koch, the Commission in its Feb-

---

13. 15 U.S.C. § 717c (1994).

14. On rehearing, petitioners specified that, although Koch had $62,312,731 in non-mileage costs under the settlement using the historic methodology, Koch nevertheless calculated its settlement interruptible transportation service ("ITS") rates as if it had $100,675,233 in non-mileage costs. Koch did not provide any explanation for this re-allocation of costs.

15. The Type I ITS rate was increased from 11.04 cents/million British thermal units ("MMBtu") (based on a $187.5 million cost of service) to 11.40 cents/MMBtu (based on a $139 million cost of service). In contrast, the settlement rates for all of the other five Type categories decreased from their previously effective levels: for example, Type II decreased from 13.60 cents/MMBtu

to 12.88 cents/MMBtu; Type VI decreased from 23.87 cents/MMBtu to 19.29 cents/MMBtu.

16. Whereas non-mileage costs on the Koch system are spread proportionately among all shippers regardless of length of haul, mileage costs increase with the distance the gas is shipped. Thus, allocating mileage costs as if they were non-mileage costs shifts costs from long-haul shippers to short-haul shippers.

17. On rehearing, petitioners submitted additional evidence of Koch's allocation of mileage-related costs to non-mileage costs, but as explained above the Commission refused to consider this evidence. However, it was Koch's burden, not petitioners', to prove that the changed rate methodology was just and reasonable.

ruary 1 order summarily approved the new rate schedule without requesting any new data from Koch or other parties, instead relying solely on the evidence produced in proceedings before the ALJ,[18] and without adequately addressing Koch's concessions. Rather, FERC merely concluded that:

> The parties are concerned that the Type I rate is higher than the rate originally proposed. However, the overall [*i.e.*, for all six types of hauls] is lower, and the rates do increase with distance. The rates clearly are, as they have been on the [Koch] system, mileage based. The Commission may have preferred that these rates be even more mileage sensitive, but the rates are consistent with the general requirement that rates be mileage based. Therefore, we will approve the Settlement rates as reasonable. . . .

74 F.E.R.C. at 61,282 (J.A. 390). Then, in its first order on rehearing, the Commission first rejected petitioners' new evidence about cost allocation, restated its position that "while some additional fine-tuning could result in rates that are even more mileage sensitive, the settlement rates comply with the Commission's policy that rates be mileage sensitive," and finally added: "Moreover, classifying costs on a mileage or non-mileage basis is largely a matter of historical practice, rather than an evidentiary issue." 75 F.E.R.C. at 61,461 (J.A. 508).

Although the Commission was justified in refusing to consider new evidence submitted for the first time on rehearing, its summary explanations fail to account for the fact that Koch, not petitioners, had the burden of proving that the new rate methodology was just and reasonable, not merely "mileage sensitive" in some way or another. If FERC felt that the reasons set forth by Koch for

changing the methodology (for example, that the new methodology allegedly provided the only means by which Koch could recover non-mileage-based costs) were legitimate, then the Commission should have stated as much and offered some sort of policy justification for this conclusion. Instead, the Commission totally failed to address the issue of whether cross-subsidization of shippers was occurring and, if so, whether such cross-subsidization was justifiable under FERC policies. For this reason, we conclude that the Commission's adoption of the proposed ITS rates was not supported by substantial evidence.

### 2. *Use of a One–Year Average Throughput Data*

■ Petitioners argue that the Commission erred in approving Koch's settlement rates insofar as they were based on the actual average demand for Koch's firm transportation service ("FTS") for the twelve-month test period that ended in June 1994. Petitioners claim that the Commission should have used higher end-of-test-period figures rather than a one-year average because the end-of-test-period figures provided a more representative basis for predicting how much gas would flow through Koch's system and how much Koch would earn during the period that the settlement rates would be in effect.[19] Koch responds in part by reiterating its earlier explanation that a twelve-month period is the appropriate gauge for its rate factors because, in contrast to other pipelines, most of the contracts held on Koch's system are short-term ones, many of which are due to expire during the term of the settlement and for which there is no assurance of renewal. Brief for Koch, at 25.

---

**18.** Although the ALJ stated that "[s]ubstantial evidence exists within Koch's Statement P to support the basic proposition that cost allocations on Koch's system cannot be directly assigned on the basis of mileage," and that "[t]herefore, the instant settlement—with rates which give less weight to mileage—certainly can be found just and reasonable without delving into the specific methodology of the settlement rates," J.A. 242, the import of these statements is unclear in light of the fact that the ALJ had already decided to sever both the contesting parties and

the issue of interruptible transportation rate design from the settlement. J.A. 241.

**19.** More specifically, petitioners contend that Koch's throughput increased dramatically during the last two months of the year-long period and that this increase was not temporary as evidenced by data showing that Koch's throughput as of September 1994 was 75.5 percent greater than in November 1993. *See* Brief for Petitioners, at 18.

After certification of the record, the Commission requested that the parties supply more data on the issue of the proper levels for the demand determinants.[20] Koch complied with FERC's data requests, but petitioners only filed a response asserting that Koch's demand billing determinants were understated and providing a table that purported to undermine Koch's data. In its initial order, however, the Commission rejected petitioners' challenge to Koch's estimates, finding that petitioners' "table is misleading" because they "compared annualized [Maximum Daily Quantity ("MDQ")] amounts to one specific month within that 12–month period, i.e., June 1994." 74 F.E.R.C. at 61,279 (J.A. 387). On rehearing, the Commission further explained:

> [Petitioners] argue that the test period data clearly demonstrated that Koch Gateway's FTS MDQ was increased in the last two months of the test period by more than 275,000 MMBtu/day. Further, they argue, looking at post test period data demonstrates that the increase in MDQ commencing in May of 1994 was not a short term phenomena [sic], but has continued to increase such that [Koch's] FTS MDQ as of September, 1994 was 75.5 percent greater than the FTS MDQ in November 1993. . . .
>
> It is correct, as [petitioners] assert, that the Commission has relied on end of test period data in some cases. However, nothing in the regulations in effect at the time the Settlement was filed require use of data from the end of the test period only. The use of the entire test period is not an unreasonable method of predicting throughput. Further, there is no reason to go outside of the test period when pro-

jecting throughput. The request for rehearing is denied.

75 F.E.R.C. at 61,461–62 (J.A. 508, 509).

We conclude that the Commission acted within its discretion by approving Koch's use of demand determinant data gleaned from a full twelve-month test period rather than from only the last one or two months of the test period. FERC regulations provide that the rate factors (*e.g.*, volume, costs and billing determinants) for a natural gas company such as Koch are to be established during a twelve-month base period but "*may* be adjusted for changes in revenues and costs which are known and measurable with reasonable accuracy at the time of the filing and which will become effective within the adjustment period." 18 C.F.R. § 154.303(a) (emphasis added).[21] Although it is true that "[c]ase law does not rigidly tie a regulator to the use of test-year figures, when later information reveals that the estimates based on those figures are likely to be seriously in error,"[22] the Commission's usual practice is to base rate factors on the one-year test period, and it "has discretion whether to use actual base year or test period data or to adjust these estimates for post-period data."[23] Moreover, "the Commission rightly does not require that history prove the accuracy of the utilities' estimates, but rather that the utility prove that the estimates were reasonable when made." *Indiana & Michigan Mun. Dist. v. FERC*, 659 F.2d 1193, 1198 (D.C.Cir.1981).

The Commission did not abuse its substantial discretion by permitting Koch to use a twelve-month base period here. Although petitioners are correct that Koch's FTS demand determinants rose during the last two months of the yearlong period, it does not follow that the end of the period is more

---

**20.** In Question 5, the Commission asked Koch to "provide support for the firm reservation billing determinants used in the settlement," J.A. 318, and in Question 6 to "provide support for the throughput determinants used in the settlement." J.A. 322.

**21.** The "adjustment period" is a period of up to nine months immediately following the 12–month base period. 18 C.F.R. § 154.303(a)(2).

**22.** *Distrigas of Massachusetts Corp. v. FERC*, 737 F.2d 1208, 1220, *vacated on other grounds*, 751 F.2d 20 (1st Cir.1984).

**23.** *National Fuel Gas Supply Corp.*, 51 F.E.R.C. ¶ 61,122 (1990) (footnote omitted); *see also Papago Tribal Auth. v. FERC*, 773 F.2d 1056, 1063 (9th Cir.1985) (remarking on the "latitude courts have given the Commission to determine whether to adopt or reject actual data from the test year").

predictive of future demand and throughput than the year-long period, especially because Koch's contracts are short-term ones that may not be renewed. In the absence of a persuasive showing by petitioners that Koch's estimates were unreasonable when made, the Commission did not err by following its standard default practice of using actual average data from a year-long base period. *National Fuel Gas Supply Corp.*, 51 F.E.R.C. ¶ 61,122 (1990) ("The Commission has made exceptions to its adherence to the test period concept where there are known and measurable changes of a substantial nature. Exceptions are warranted if subsequent events indicate that the test period estimates were substantially in error or would yield unreasonable results.") (footnote omitted).

### 3. *Flat Rate Fuel Costs*

 The settlement approved by FERC included a two percent flat fuel charge to be assessed by volume irrespective of distance traveled. This was a slight decrease from Koch's previously effective flat rate of 2.3 percent. In approving the two percent rate, the Commission explained:

> [Koch's] current tariff does not provide for a mileage based fuel charge, and the Settlement results in a reduction in the fuel charge to all customers. The Commission generally encourages mileage based rates where they are appropriate, but in these circumstances, we will not require a mileage based fuel charge at this time. As noted above, we will continue to monitor this issue.

74 F.E.R.C. ¶ 61,088, at 61,282 (J.A. 390). As with the change in ITS rate methodology, Koch had the burden of showing that its new

rate was fair and reasonable; petitioners argue that Koch failed to meet this burden since the evidence in the record indicated that Koch would substantially overcollect its fuel costs at that rate. Petitioners propose that either (1) the flat rate should be lower because Koch included a large amount of "lost and unaccounted for" gas in its calculation; or (2) the flat rate should be replaced by a mileage-based graduated rate.

Notwithstanding petitioners' arguments, we conclude that FERC's approval of the two percent rate was supported by substantial evidence, and that Koch did meet its burden of showing that its new rate was just and reasonable. For one thing, no evidence was produced to suggest that Koch was changing its rate methodology at all, and the two percent rate was only slightly different than the previous 2.3 percent rate. Moreover, in contrast with FERC's failure to solicit additional data with regard to Koch's change in the ITS rate methodology, the Commission did seek more information from Koch about its flat fuel charge after certifying the record,[24] and Koch in turn supplied data that supported the rate level.[25] Petitioners failed to produce any rebuttal evidence until the petition for rehearing, preferring to rely on their unsubstantiated assertions that Koch's "argument that mileage-related fuel rates would be too difficult to calculate due to multidirectional flows, seasonal variations and pathing fuel consumption are the same arguments used and rejected on other pipeline systems," and that "[Koch's] fuel design requires short-haul shippers to subsidize [Koch's] exchange transportation and longer haul transportation on its system." J.A. 344, 345.[26] In light of the evidence submitted by

---

**24.** In Question 7, the Commission made the following request to Koch:
 A) Please provide support for the fuel retention percentage used in the settlement. Include the actual base and test period fuel used, and the lost and unaccountable amounts.
 B) Provide justification for not using a mileage basis in developing the fuel usage.
 J.A. 324.

**25.** Koch attached data that showed its fuel retention percentage was 2.02 percent. J.A. 326. Koch also explained that its fuel retention rate was not mileage-based "because of the difficulty

of specifically pathing fuel" in its transportation system due to "the multi-directional flow nature ... and the seasonal variations in flow patterns." J.A. 324.

**26.** Petitioners also stated that they would "demonstrate how [Koch's] system operates and how the operation of its system is consistent with the development of either distance-based fuel rates or separate fuel rates per Capacity Allocation Area," J.A. 344–45 (citation omitted), but they failed to produce any further evidence until the petition for rehearing.

Koch and petitioners' failure to rebut this evidence prior to the petition for rehearing, we uphold FERC's approval of the two percent flat fuel charge.

### III. CONCLUSION

For the foregoing reasons, we conclude that the Commission did not commit procedural error in reaching the merits of the settlement agreement or in refusing to consider evidence first put forth by petitioners in their petitions for rehearing. We further conclude that both the use of a twelve-month test period in calculating settlement rates and the two percent flat fuel charge assessed by Koch were supported by substantial evidence. However, we find that there was insufficient evidence in the record to support the Commission's approval of Koch's interruptible transportation rates. Accordingly, the petition for review is granted in part and denied in part.

*So ordered.*