**Richard D. MUDD, M.D., Plaintiff,**

v.

**Louis CALDERA, Secretary of the Army, et al., Defendants.**

**No. CIV.A. 97–2946(PLF).**

United States District Court, District of Columbia.

March 14, 2001.

Philip A. Gagner, Shaughnessy Volzer & Gagner, Washington, DC, for Plaintiff.

Wyneva Johnson, Assistant U.S. Attorney, Washington, DC, for Defendant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

The Court previously granted plaintiff's first motion for summary judgment with respect to Count One, which resulted in a remand to the Secretary of the Army, and dismissed the other two counts of the complaint. *See Mudd v. Caldera,* 26 F.Supp.2d 113 (D.D.C.1998). After the Secretary's decision on remand, this case is back before the Court on plaintiff's second motion for summary judgment and defendants' cross-motion to dismiss or, in the alternative, for summary judgment. As a result of the remand, Count One effectively has become moot and the issue now before the Court relates to Count Four of plaintiff's amended and supplemental petition and complaint which addresses the new March 6, 2000 decision of the Secretary of the Army, once again denying plaintiff's request to amend military records.

## I. FACTUAL BACKGROUND

The factual background and context of this case are fully set out in this Court's earlier opinion in *Mudd v. Caldera,* 26 F.Supp.2d at 115–18. Briefly, plaintiff, Dr. Richard D. Mudd, is the grandson of Dr. Samuel Mudd, who was arrested, charged and convicted before a military commission, the Hunter Commission, of aiding and abetting as an accessory after the fact in the conspiracy to kill President Abraham Lincoln and other government officials. Specifically, on the night of Lincoln's assassination, the first Dr. Mudd provided shelter and medical treatment to John Wilkes Booth and his companion, David Herold, and the next day gave them horses so they could continue on their way.

*Id.* at 116. Dr. Samuel Mudd argued at the time of his trial that the Hunter Commission lacked jurisdiction and that his trial before the Commission violated his constitutional right to a trial by jury in a civilian court with all its protections. The Commission itself, Attorney General James Speed, and Judge Thomas Jefferson Boynton of the United States District Court for the Southern District of Florida all rejected this argument. *See id.* at 116–17; Admin. Record at 360–66, 410–11, 432–33; *Ex parte Mudd,* 17 F. Cas. 954 (S.D.Fla.1868). Dr. Mudd was convicted and sentenced to life imprisonment, but later was granted a full and unconditional pardon by President Andrew Johnson because of his service in battling the yellow fever epidemic while in prison. *Mudd v. Caldera,* 26 F.Supp.2d at 117.

█ More than a century later, Dr. Mudd's grandson, Dr. Richard Mudd, filed an application with the Army Board for Correction of Military Records ("ABCMR"), asserting both that Dr. Mudd was in fact not guilty of the offense with which he was charged and that the Commission lacked jurisdiction to try him. After a hearing, the ABCMR found that it was not authorized to consider the actual innocence or guilt of Dr. Mudd, but it unanimously concluded that the Commission did not have jurisdiction to try him and recommended that his conviction therefore be set aside. *Mudd v. Caldera,* 26 F.Supp.2d at 117. William D. Clark, Acting Assistant Secretary of the Army, denied the Board's recommendation.[1] Acting on Dr. Mudd's request for reconsideration, Assistant Secretary of the Army Sara Lister subsequently reviewed the matter and again concluded that the Com-

---

1. It is permissible for the Secretary to delegate his authority in such matters to an Assistant Secretary. *See Kreis v. Secretary of the* *Air Force,* 866 F.2d 1508, 1509 (D.C.Cir. 1989).

mission had jurisdiction; she, too, denied Dr. Mudd's request for relief. *Id.* at 118.

When this case was first before this Court, the Court recognized its limited role and the deference it owed to the Secretary under the Administrative Procedure Act and the relevant case law. *See Chappell v. Wallace,* 462 U.S. 296, 303, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *Kreis v. Secretary of the Air Force,* 866 F.2d 1508, 1512, 1514–15 (D.C.Cir.1989). Applying this Circuit's decision in *Frizelle v. Slater,* 111 F.3d 172, 176–78 (D.C.Cir.1997), the Court nevertheless found (1) that Assistant Secretary Lister's decision was arbitrary and capricious under the APA because it did not consider or address a seemingly meritorious and certainly non-frivolous argument raised by Dr. Richard Mudd; and (2) that her decision was based in part on the premise that Dr. Samuel Mudd could have judicially challenged the jurisdiction of the Commission even after he was pardoned, a premise for which there was no support either in the Administrative Record or in existing law at the time. *See Mudd v. Caldera,* 26 F.Supp.2d at 120, 121–23.

At the hearing before the ABCMR, Dr. Richard Mudd presented the testimony of Dr. Jan Horbaly, an expert on court martial jurisdiction. Dr. Horbaly testified that there were four types of military jurisdiction, two of which were arguably relevant: "martial law" jurisdiction and "law of war" jurisdiction. *Mudd v. Caldera,* 26 F.Supp.2d at 121. According to Dr. Horbaly, the Commission could not have been exercising martial law jurisdiction because the military only has martial law jurisdiction if the civilian courts are closed, which was not the case here. *Id.* Dr. Horbaly also testified that he did not believe the Commission had law of war jurisdiction because such jurisdiction only exists (1) when the civilian courts are closed and an American civilian is charged with treason, or (2) when a state of war exists and a non-citizen "belligerent" is accused of violating the accepted rules of war. *Id.* at 122. There is no dispute that the civilian courts were open. Dr. Horbaly testified that the Commission therefore could only have had law of war jurisdiction if there was still a state of war and if Dr. Mudd was a non-citizen belligerent and was charged with violating the accepted rules of war. *Id.* He concluded that because Dr. Mudd was a citizen of the United States and a citizen of Maryland, a state that had not seceded from the Union and was never at war with the Union, Dr. Mudd should not have been subject to "law of war" jurisdiction and tried before a military tribunal. *Id.* The ABCMR agreed. While Assistant Secretary Lister appeared to agree with Dr. Horbaly and the ABCMR that the Hunter Commission did not have martial law jurisdiction, she rejected the view of the ABCMR that there was no law of war jurisdiction. *Id.*

In vacating and remanding Assistant Secretary Lister's decision to the Secretary of the Army, this Court found that the "fundamental problem" with her decision lay in the fact that she never addressed the argument that Dr. Samuel Mudd was a citizen of the United States and a citizen of Maryland, a non-secessionist state. Because of this failing, Assistant Secretary Lister also never considered the expert opinion of Dr. Horbaly that for these reasons the Commission could not lawfully exercise law of war jurisdiction over Dr. Mudd. *Mudd v. Caldera,* 26 F.Supp.2d at 123. Assistant Secretary Lister therefore never indicated whether she believed that such citizenship would or would not preclude the exercise of law of war jurisdiction. This Court concluded under *Frizelle* that it was arbitrary and capricious for her not even to address Dr. Richard Mudd's

law of war argument and the evidence he had presented in support of it. *Id.*

On remand, the matter fell to Assistant Secretary of the Army Patrick T. Henry for decision. In his decision, Assistant Secretary Henry did not find it necessary to deal with that portion of Assistant Secretary Lister's decision finding that Dr. Samuel Mudd had failed to seek judicial relief after receiving a pardon and this Court's opinion that that portion of her decision was not supported by substantial evidence. *See* Notice of Filing of March 6, 2000 Decision of Patrick Henry, Assistant Secretary of the Army for Manpower and Reserve Affairs ("Henry Decision") at 1.[2] Instead, he focused exclusively on the "dispositive issue" of whether the Commission had jurisdiction to try Dr. Mudd. *Id.* Assistant Secretary Henry acknowledged in his decision that Dr. Mudd was a citizen of the State of Maryland, a non-secessionist state, that Dr. Mudd was not formally a member of either the Union or Confederate Army during the Civil War, and that the civilian courts in Washington, D.C. were open at the time the Commission tried Dr. Mudd. *Id.* He concluded, however, that these facts "are not critical" to deciding whether the Commission had jurisdiction in this case. *Id.*

Assistant Secretary Henry then turned to two decisions of the United States Supreme Court, *Ex parte Milligan,* 71 U.S. 2, 4 Wall. 2, 18 L.Ed. 281 (1866), the case primarily relied upon by the ABCMR, and the later decision of the Court in *Ex parte Quirin,* 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942). He found that *Quirin,* a decision that dealt with "law of war" jurisdiction, was more relevant than *Milligan,* which he concluded dealt primarily with "martial law" jurisdiction. Henry Decision at 1. Assistant Secretary Henry stated expressly that he fully considered Dr. Horbaly's

testimony and acknowledged the facts on which Dr. Horbaly relied but did not agree with Dr. Horbaly's opinion that a United States citizen could not be tried by a military commission: "I do not agree with his opinion and interpretation of Ex Parte Quirin that citizens of the United States cannot be tried by a military commission when the civilian courts are in operation." *Id.* at 2, 4 Wall. 2. Assistant Secretary Henry concluded that regardless of these facts a military tribunal has jurisdiction to try "civilian belligerents for law of war and military violations." *Id.* He found that "Dr. Mudd's citizenship in the State of Maryland is not dispositive of the issue of whether the military tribunal had jurisdiction because Dr. Mudd was charged with acting as an enemy belligerent by aiding and abetting those who have violated the laws and customs of war." *Id.* Assistant Secretary Henry also noted that Washington, D.C. "remained under a form of martial law at the time of the Lincoln assassination," that conditions "tantamount to a state of war" existed at the time of the assassination and Dr. Mudd's trial, and that "the state of hostilities we now call the Civil War was not legally declared at an end until 1866." *Id.*

## II. DISCUSSION

The plaintiff, Dr. Richard Mudd, argues that the new decision of the Department of the Army is as flawed as the first one and that this Court must again conclude that the Army acted arbitrarily, capriciously and contrary to law. He also argues that there is no substantial evidentiary basis in the record for some of Assistant Secretary Henry's predicate facts. Specifically, he argues that there is no record evidence to support the characterization of Dr. Samuel Mudd as an "unlawful enemy belligerent";

---

**2.** This Court sees no need to revisit that issue either.

he maintains that as a "non-enemy belligerent" Dr. Mudd necessarily was a civilian and an American citizen and that he therefore had to be tried in a civilian court, as the Supreme Court required for such persons in *Milligan*. In plaintiff's view, *Quirin* is not to the contrary because the Supreme Court in *Quirin* required that the Army meet a five-part test in order to classify someone as an "enemy belligerent" and subject him to law of war jurisdiction before a military commission—a test he says the Army failed to meet here. Plaintiff also argues that there is no support in the record for Assistant Secretary Henry's finding that the Civil War was still going on or that "conditions tantamount to a state of war existed" at the time of President Lincoln's assassination and Dr. Mudd's trial.

The Army argues that it now has fully addressed the only dispositive question this Court required it to consider on remand—namely, the issue of whether Dr. Mudd was a citizen of the United States and a citizen of Maryland, a non-secessionist state—and that it now has considered the expert testimony of Dr. Horbaly that the Commission could not exercise law of war jurisdiction over such a citizen when the civilian courts were open. It has acknowledged that Dr. Mudd was a citizen of the United States and of non-secessionist Maryland, but it simply found those facts not to be critical to the question of jurisdiction. Specifically, the Army maintains that while American citizenship may be relevant under *Milligan* in determining whether a military tribunal has martial law jurisdiction, it is not relevant in determining whether it has law of war jurisdiction. It argues that the Supreme Court's opinion in *Quirin* supports its position that the civilian courts do not have exclusive jurisdiction over law of war violations merely because certain criminal acts were committed by a "civilian belligerent." Because it

is not bound by Dr. Horbaly's opinion and because it says its findings are supported by substantial evidence in the record, the Army argues that this Court should defer to its reasonable judgment on this matter and hold that its ultimate conclusion that the Commission properly exercised jurisdiction over Dr. Samuel Mudd was not arbitrary or capricious.

 The Court agrees that the Army now has complied with this Court's directive to address "a seemingly meritorious argument" and to consider the evidence introduced before the ABCMR in support of it. *Mudd v. Caldera*, 26 F.Supp.2d at 121. The Army now has recognized that the facts urged upon it by plaintiff are indeed supported by record evidence. *See* Henry Decision at 1 (acknowledging that Dr. Samuel Mudd was a citizen of the United States and of a non-secessionist state, that he was not formally a member of either the Union or Confederate Army, and that the civilian courts were open). The Army simply disagrees with plaintiff's expert, Dr. Horbaly, as to the significance of these facts. Clearly, Assistant Secretary Henry was not bound to accept the expert witness' opinion. *See Avondale Indus., Inc. v. Director, Office of Workers' Comp. Programs*, 977 F.2d 186, 189 (5th Cir.1992); *see also United States v. Jackson*, 425 F.2d 574, 577 (D.C.Cir. 1970). Furthermore, once he fairly considered all the evidence in the record, Secretary Henry was free to draw his own reasonable inferences and conclusions from the evidence before him. *See Mail Order Ass'n of America v. United States Postal Serv.*, 2 F.3d 408, 421 (D.C.Cir.1993); *George Hyman Constr. Co. v. Washington Metro. Area Transit Auth.*, 816 F.2d 753, 758 (D.C.Cir.1987); *see also NLRB v. Winnebago Television Corp.*, 75 F.3d 1208, 1212 (7th Cir.1996); *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 151 (3d Cir.1994). So

long as Secretary Henry gave a rational explanation for his decision based on the record evidence, which he has done in this case, *see* Henry Decision at 2–3, this Court normally would go no further and simply uphold his decision both because it was based on substantial evidence in the record and because it was not arbitrary, capricious or an abuse of discretion. *See* 5 U.S.C. § 706(2)(A), (E); *Frizelle v. Slater*, 111 F.3d at 176; *Kreis v. Secretary of the Air Force*, 866 F.2d at 1514–15 *Miller v. Lehman*, 801 F.2d 492, 497 (D.C.Cir.1986).

In the usual case, that would be the end of the matter. In this case, however, the question of whether the Army's decision is arbitrary or capricious "or otherwise not in accordance with law" turns on the Army's reading, interpretation and application of certain decisions of the United States Supreme Court. And in arguing that this Court should be deferential to it, the Army suggests that the Court must defer not only to its reasoned judgments based on its evaluation of the evidentiary record but also that it must defer to the Army's interpretation of these Supreme Court decisions. The Court must reject this argument.

▮▮▮ Certainly, the courts are admonished to defer to agencies in areas of their special expertise, *see Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376–77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Cellwave Telephone Services v. FCC*, 30 F.3d 1533, 1536 (D.C.Cir.1994); *American Federation of Government Employees v. Federal Labor Relations Authority*, 815 F.2d 718, 720 n. 11 (D.C.Cir. 1987), or where they are interpreting a statute entrusted to them to administer by Congress or their own agency regulations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Exxon Corp. v. FERC*, 114 F.3d 1252, 1258 (D.C.Cir.

1997); *Cellwave Tel. Servs. v. FCC*, 30 F.3d at 1536; *Stuart–James Co. v. SEC*, 857 F.2d 796, 800 (D.C.Cir.1988). And a court's review of decisions of boards for the correction of military records requires an "unusually deferential application of the 'arbitrary or capricious' standard." *Cone v. Caldera*, 223 F.3d 789, 793 (D.C.Cir.2000) (quoting *Kreis v. Secretary of the Air Force*, 866 F.2d at 1514). But there is no law that supports the Army's position that an Article III judge must defer to an agency or department of the Executive Branch or the head of such an agency or department—even to the Secretary of a branch of the military—on interpretations of decisions of the United States Supreme Court; for that is quintessentially a judicial function. *See Jacoby v. NLRB*, 233 F.3d 611, 613–14 (D.C.Cir.2000); *Akins v. FEC*, 101 F.3d 731, 740 (D.C.Cir.1996) (*en banc*), *vacated on other grounds FEC v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998); *Public Citizen v. Burke*, 843 F.2d 1473, 1478 (D.C.Cir.1988). Judge Silberman put it this way for the *en banc* court in *Akins*:

We are not obligated to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other principle.... There is ... no reason for courts—the supposed experts in analyzing judicial decisions—to defer to agency interpretations of the [Supreme] Court's opinions. This is especially true where, as here, the Supreme Court precedent is based on constitutional concerns, which is an area of presumed judicial competence.

*Akins v. FEC*, 101 F.3d at 740.

▮▮ As Chief Justice Marshall said long ago: "It is emphatically the power and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 177, 2 L.Ed. 60 (1803). *See Cooper v. Aaron*, 358 U.S. 1,

18, 78 S.Ct. 1401, 3 L.Ed.2d 5, 3 L.Ed.2d 19 (1958) ("the federal judiciary is supreme in the exposition of the law of the Constitution"); *see also Planned Parenthood v. Casey,* 505 U.S. 833, 867–68, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *United States v. Nixon,* 418 U.S. 683, 703, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Powell v. McCormack,* 395 U.S. 486, 505–06, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). "The federal Judiciary does not ... owe deference to the Executive Branch's interpretation of the Constitution." *Public Citizen v. Burke,* 843 F.2d at 1478 (citing *United States v. Nixon,* 418 U.S. at 703–05, 94 S.Ct. 3090). To paraphrase, orderly government requires that the Army be as scrupulous not to attempt to interfere with judicial matters as the judiciary must be scrupulous not to intervene in legitimate Army matters; and it is the responsibility of the judiciary to guard against such interference. *See Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953).

The question for the Court then is whether *in its view* the Supreme Court's decision in *Ex parte Quirin* supports the Secretary's decision that the Commission could properly exercise jurisdiction over Dr. Samuel Mudd, or whether *Ex parte Milligan* forecloses such a decision.

In *Quirin,* the Supreme Court recognized the right of military commissions "to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals." *Ex parte Quirin,* 317 U.S. at 28, 63 S.Ct. 2. It distinguished between "lawful belligerents"—that is, soldiers in uniform—and "unlawful belligerents"—persons such as spies or combatants not wearing uniforms or in disguise, who may come secretly across enemy lines for the purpose of robbing, killing, or destroying bridges, roads,

canals, etc. *Id.* at 31, 33, 63 S.Ct. 2. Such "unlawful belligerents" may be tried and punished by military commissions according to "the law of war." *Id.* at 35, 63 S.Ct. 2. Throughout *Quirin,* the Court referred to these persons as "familiar examples" of unlawful belligerents, *id.* at 31, 63 S.Ct. 2, and to the described conduct of such persons as "illustrative of the common law of war." *Id.* at 34, 63 S.Ct. 2. But they were just that—only examples and illustrations. A careful reading of *Quirin* discloses that the Court established no five-part test, as plaintiff argues, to determine who is an "enemy belligerent" or when the exercise of "law of war" jurisdiction is appropriate. The Court simply listed the considerations that led to its conclusion in *Quirin* that the exercise of law of war jurisdiction by a military commission was appropriate on the facts presented in that case.

■ Admittedly, the Court in *Quirin* sometimes used the term "enemy belligerent" and sometimes the term "unlawful belligerent," but, plaintiff's argument to the contrary notwithstanding, it appears that the Court intended no distinction of significance. While the decision in *Quirin* clearly permits the exercise of jurisdiction by a military commission over those "acting under the [express] direction of enemy armed forces," it does not exclude the exercise of jurisdiction over those who are not under such direction. *See Ex parte Quirin,* 317 U.S. at 37, 63 S.Ct. 2. Nor is it necessary under *Quirin* that an unlawful belligerent be a citizen of an enemy sovereign. *Id.* ("Citizenship in the United States of an enemy belligerent does not relieve him of the consequences of a belligerency which is unlawful because of a violation of the law of war"). Under *Quirin,* citizens and non-citizens alike—whether or not members of the military, or under its direction or control, may be subject to the jurisdiction of a military com-

mission for violations of the law of war. *See Ex parte Quirin*, 317 U.S. at 45, 63 S.Ct. 2. *See also Duncan v. Kahanamoku*, 327 U.S. 304, 313–14, 66 S.Ct. 606, 90 L.Ed. 688 (1946) (referring to "the well-established power of the military to exercise jurisdiction over enemy belligerents, prisoners of war, *or others charged with violating the laws of war*") (emphasis added).

█ While plaintiff makes a strong argument to the contrary, this Court finds that the *Milligan* decision does not foreclose these conclusions. In rejecting the notion that law of war jurisdiction can never be applied to "citizens in states which have upheld the authority of the government, and where the courts are open and their process unobstructed," *Ex parte Milligan*, 71 U.S. at 121, 4 Wall. 2, the Supreme Court in *Quirin* said: "We construe the Court's statement [in *Milligan*] as to the inapplicability of the law of war to Milligan's case as having particular reference to the facts before it." *Ex parte Quirin*, 317 U.S. at 45, 63 S.Ct. 2. It was on the basis of those unique facts that the Supreme Court concluded "that Milligan, not being a part of or associated with the armed forces of the enemy, was a non-belligerent, not subject to the law of war save as . . . martial law might be constitutionally established. . . ." *Id.* Reading *Mil-*

*ligan* and *Quirin* together, this Court therefore concludes that if Dr. Samuel Mudd was charged with a law of war violation, it was permissible for him to be tried before a military commission even though he was a United States and a Maryland citizen and the civilian courts were open at the time of his trial.[3]

The final question then is whether Dr. Samuel Mudd was in fact charged with a violation of the "law of war"? As Dr. Horbaly testified: "It is really a wide open field as to what is a violation of the law of war." Admin. Record at 246. And in *Quirin*, the Supreme Court found it unnecessary "to define with meticulous care the ultimate boundaries of the jurisdiction of military tribunals to try persons according to the law of war." *Ex parte Quirin*, 317 U.S. at 45–46, 63 S.Ct. 2. It was enough that the facts presented there "were plainly within those boundaries . . ." *Id.*

In this case, both the Commission itself, *see* Admin. Record at 410–11, and Judge Boynton found a law of war violation.[4] As Judge Boynton said:

The President was assassinated not from private animosity, nor any other reason than a desire to impair the effectiveness of military operations, and enable the rebellion to establish itself into a Government; the act was committed in

---

3. Contrary to plaintiff's argument, the Supreme Court has also made clear that a military commission may be convened even "after hostilities have ended to try violations of the law of war committed before their cessation, at least until peace has been officially recognized by treaty or proclamation of the political branch of the Government." *In re Yamashita*, 327 U.S. 1, 12, 66 S.Ct. 340, 90 L.Ed. 499 (1946). *See also Johnson v. Eisentrager*, 339 U.S. 763, 786, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) ("The jurisdiction of military authorities, *during or following hostilities*, to punish those guilty of offenses against the laws of war is long established.") (emphasis added). Thus, the fact that Lee had surren-

dered at Appomatox one month before Dr. Mudd's trial is irrelevant because, as Assistant Secretary Herny found, the Civil War was not legally declared at an end until 1866. *See* Henry Decision at 2.

4. So did Attorney General Speed, but his initial one-sentence legal opinion (Admin. Record at 22), "the shortest [legal opinion] ever issued by any Attorney General," and his later elaboration (Admin. Record at 360–66) are entitled to little consideration. *See* WILLIAM H. REHNQUIST, ALL THE LAWS BUT ONE: CIVIL LIBERTIES IN WARTIME 145 (1998). *See id.* at 119–20.

a fortified city, which had been invaded during the war, and to the northward as well as the southward of which battles had many times been fought; which was the headquarters of all the armies of the United States, from which daily and hourly went military orders. The President is the Commander in Chief of the army and the President who was killed had many times made distinct military orders under his own hand, without the formality of employing the name of the Secretary of War or commanding general. It was not Mr. Lincoln who was assassinated, but the Commander in Chief of the army for military reasons. I find no difficulty therefore, in classing the offense as a military one, and with this opinion, arrive at the necessary conclusion that the proper tribunal for the trial of those engaged in it was a military one.

*Ex parte Mudd,* 17 F. Cas. 954. Assistant Secretary Henry agreed. He found "that the charges against Dr. Mudd (*i.e.,* that he aided and abetted President Lincoln's assassins) constituted a military offense rendering Dr. Mudd accountable for his conduct to military authorities and, therefore, subject to trial by the Hunter Commission, a properly constituted military commission" which President Johnson properly determined was "the appropriate tribunal to hear the case." Henry Decision at 3. In view of the foregoing analysis and this Court's own reading of *Milligan* and *Quirin,* the Court cannot say that Secretary Henry's decision was arbitrary, capricious or not in accordance with law. A different reading of the case law might lead to a different result, but based on its analysis of *Quirin* and *Milligan* the Court must conclude that the decision to charge Dr. Mudd with a law of war violation cannot be disturbed. Plaintiff's second motion for summary judgment therefore will be denied and defendant's cross-motion for summary judgment will be granted.

An Order and Judgment consistent with this Opinion shall be issued this same day.

SO ORDERED.

### ORDER AND JUDGMENT

The Court previously granted plaintiff's first motion for summary judgment with respect to Count One, which resulted in a remand to the Secretary of the Army, and dismissed the other two counts of the complaint. *See Mudd v. Caldera,* 26 F.Supp.2d 113 (D.D.C.1998). As a result of the remand, Count One effectively has become moot and the issue now before the Court relates to the one remaining count, Count Four of plaintiff's amended and supplemental petition and complaint which addresses the new March 6, 2000 decision of the Secretary of the Army, once again denying plaintiff's request to amend military records. Upon consideration of the arguments presented by the parties in their briefs and at the October 2, 2000 motions hearing, and the entire record in this case, and for the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that plaintiff's second motion for summary judgment is DENIED; it is

FURTHER ORDERED that defendants' cross-motion for summary judgment is GRANTED; it is

FURTHER ORDERED that JUDGMENT is entered for defendants on Count Four; it is

FURTHER ORDERED that Count One is DISMISSED as moot; it is

FURTHER ORDERED that this case is dismissed from the docket of this Court; and it is

FURTHER ORDERED that this Order and Judgment shall constitute a FINAL

JUDGMENT in this case. This is a final appealable order. *See* Rule 4(a), Fed. R.App. P.

SO ORDERED.